UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

| | | |
|---|---|---|
| AMANDA LOCKE, | ) | Civil Action No.: 4:23-cv-00085-TER |
| | ) | |
| Plaintiff, | ) | |
| | ) | ORDER |
| -vs- | ) | |
| | ) | |
| KILOLO KIJAKAZI, | ) | |
| Acting Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

This is an action brought pursuant to Section 205(g) of the Social Security Act, as amended, 42 U.S.C. Section 405(g), to obtain judicial review of a "final decision" of the Commissioner of Social Security, denying Plaintiff's claim for child disability insurance benefits and supplemental security income (SSI). Plaintiff turned 18 before the application date and claimant's representative stipulated it was an adult case. (Tr. 15). The ALJ appropriately performed the Five Step analysis for adults and not the Eight Step Analysis for children.  The only issues before the Court are whether the findings of fact are supported by substantial evidence and whether proper legal standards have been applied. This action is proceeding before the undersigned pursuant to 28 U.S.C. § 636(c) and Fed. R. Civ. Proc. R. 73.

## I.  RELEVANT BACKGROUND

### A.    Procedural History

As history, Plaintiff was originally granted benefits in 2010 with a 2006 onset date, as she met Listing 112.11. (Tr. 150). When she turned 18, a redetermination under adult standards was required. Benefits were ceased as of May 2016. (Tr. 150). Plaintiff did not attend the hearing for that case. (Tr. 151). A finding of insufficient evidence was made in December 2016 and benefits were

ceased. (Tr. 151-155).

Plaintiff then filed an application in May 2017, the application that is before the court, alleging disability beginning on December 31, 2006. (Tr. 15). Her claims were denied initially and upon reconsideration. Thereafter, Plaintiff filed a request for a hearing. A hearing was held on May 22, 2019, at which time Plaintiff and a vocational expert (VE) testified. (Tr. 15). At the hearing, Plaintiff's representative discussed amending the onset date to the application date but no amended onset date change form was submitted. (Tr. 15). The ALJ therefore adjudicated the complete period of the claimant's claims as of her 18th birthday in November 2015. (Tr. 15, 440). The Administrative Law Judge (ALJ) issued an unfavorable decision in July 2019, finding that Plaintiff was not disabled within the meaning of the Act. (Tr. 15-26). Plaintiff filed a request for review of the ALJ's decision. The Appeals Council denied the request for review. On May 31, 2020, Plaintiff filed an action in this court, which was remanded "for the ALJ to explain how the RFC accounts for limitations in concentration, persistence, and pace." No. 4:20-cv-2050-TER;(Tr. 532). In October 2022, another hearing was held, and in November 2022, the ALJ issued another unfavorable decision. (Tr. 440-455). Plaintiff did not file exceptions and the Appeals Council did not assume jurisdiction. Plaintiff filed an action in this court in January 2023. (ECF No. 1).

**B.    Plaintiff's Background and Medical History**

Plaintiff was born on November 16, 1997, and was nine years old at the alleged onset date. (Tr. 25). Plaintiff had no past relevant work. Plaintiff alleges disability originally due to intermittent explosive disorder, ADD, migraines, and trouble learning. (Tr. 107).

Mental Health closed their file in 2014 because of no participation and no contact. There were problems with Plaintiff's mother's health and transportation. (Tr. 383).

2

**2015**

The first quarter report card of Plaintiff's last year of high school noted "D"s in Nail Technology and Access Environmental Studies; she failed to turn in assignments and to work to potential. Plaintiff had a 96 in Art. (Tr. 351). In the second quarter, Access Environmental Studies dropped to 59 and Art dropped to 73. Total absences were 27. (Tr. 352).

There are no other records for the year 2015.

**2016**

On February 17, 2016, Plaintiff was seen by NP Sanders. (Tr. 368). Plaintiff reported a history of depression and ADD. (Tr. 368). Plaintiff was to schedule with a different provider for workup of ADD. (Tr. 369).

On March 1, 2016, Dr. Moody, Ph.D., an examining consultant, administered five tests and an interview. (Tr. 355-362). Plaintiff was not yet back on prescription medication at this exam. Dr. Moody only reviewed records of a 2008 exam. (Tr. 355). Plaintiff's mother(referred to as such but not Plaintiff's biological mother) stated as to the reason for the application that she was already getting benefits since she was about 10 for ADHD and learning abilities. (Tr. 355). Plaintiff's non-biological mother stated Plaintiff's father did not allow Plaintiff's biological mother to give birth in a hospital and there was no known information about prenatal development. Plaintiff was left in the care of her father when she was one. (Tr. 356). Plaintiff's father has a long history of mental illness and violence. (Tr. 356). Plaintiff's mother stated Plaintiff was in speech therapy for six years. ADHD medication helped to some extent. (Tr. 356). "However, she is not currently prescribed medication but has plans to see a physician tomorrow regarding treatment for attention problems." Plaintiff reported she was unorganized, forgetful, and loses things. Plaintiff becomes hyperfocused

3

visually especially in front of the television. At the interview, Plaintiff was somewhat fidgety with rapid speech at times. Plaintiff's mother reported Plaintiff hits herself a lot. Plaintiff becomes verbally aggressive, screaming. Plaintiff's mother reported police have been called, but Plaintiff was never arrested. Plaintiff's mother reported Plaintiff punched and slapped her. (Tr. 356). Plaintiff's mother allowed Plaintiff's 40+ year old "boyfriend" to live with them when Plaintiff was 14-15 years old. DSS removed Plaintiff from the home after abuse began by him and he was criminally charged. Plaintiff refused to speak about that and began crying. (Tr. 356). As to Plaintiff's mood, Plaintiff reported she was "mostly alright" but had been mad a couple of times. Plaintiff's mother reported her mood as depressed and that she slept over twelve hours a day. (Tr. 356). Plaintiff denied any ideations, delusions, or hallucinations. (Tr. 357). Plaintiff reported one hospitalization when she was 12-13 for suicidal ideations. Plaintiff was not currently on medication; in the past, Plaintiff had been prescribed Prozac, Trazodone, and Vyvanyse. The medication was helpful in symptom control of ADHD and was to be sought again the next day. (Tr. 357). Counseling was minimally helpful. Plaintiff admitted to self-harming behaviors of hitting. (Tr. 357). Plaintiff was a senior in high school at the time of the exam. Plaintiff was in special education self-contained classes and would receive a certificate of completion. (Tr. 357). Plaintiff had impulsive behaviors and once cut a peer's hair during class. (Tr. 357). Plaintiff's father has no visitation rights. (Tr. 358). Plaintiff had a history of abuse and trauma. (Tr. 358). Plaintiff was a member of the National Historical Art Society at school. (Tr. 358). Plaintiff's hygiene was good. (Tr. 359). At times, her speech was rapid. "She had a slight articulation issue, but it was hardly unnoticeable." "Her affect was wide, but she cried when her past abuse was discussed." Plaintiff's mood was normal overall. Plaintiff had distractible thought processes. Plaintiff made comments about things she saw which distracted her from the conversation.

4

Memory and concentration were very poor. Judgment and insight were somewhat limited. Plaintiff's mini mental score was 20/30. Plaintiff identified 2/3 items on delayed recall. Plaintiff did not know the county. (Tr. 359). Plaintiff had a full scale IQ of 76. (Tr. 359). On the WRAT, Plaintiff's sentence comprehension was grade equivalent to 2.8. "Her concentration is obviously impaired and she was distracted during the interview. By her self-report, she admitted that she is forgetful and loses things." Because of those symptoms, a diagnosis of ADHD inattentive type was suggested. (Tr. 360-361). "It is unclear if she has a mood disorder or if she has symptoms more consistent with [PTSD], but this diagnosis should be considered." (Tr. 361). Plaintiff's verbal and nonverbal abilities fell within the borderline range. Plaintiff's "test scores show a borderline level of intelligence. However, she has a significant weakness in concentration/attention which explains why her education has been so difficult. She has a previous diagnosis of ADHD which appears consistent with this score. However, she is unmedicated at this time and could benefit from medication treatment." (Tr. 361). As to limitations, Dr. Moody opined that Plaintiff's "attention and concentration are extremely impaired. She cannot carry out simple instructions. Her pace and persistence are also strongly impacted by her concentration and attention." (Tr. 362).

On March 2, 2016, Plaintiff was seen by Dr. Menezes. (Tr. 370). Plaintiff had been on medications for depression and ADHD in the past but had not seen mental health in about 7-8 months. Plaintiff denied any symptoms except for headaches. Plaintiff reported depression under review of symptoms. (Tr. 370). There was no mental exam. Plaintiff was referred to mental health for ADHD. Prozac was prescribed. (Tr. 371).

On May 11, 2016, Plaintiff restarted with mental health. (Tr. 389). Plaintiff reported needing ADD medications and having a lot of anger outbursts. Plaintiff admitted she had been abused. (Tr.

389). Plaintiff wanted to be a nail tech. (Tr. 390). Plaintiff s goal was to get on medications and "start not yelling." (Tr. 391). Upon exam, Plaintiff had cooperative attitude, happy mood, normal thought process/content, and intact memory. (Tr. 391). Plaintiff was usually able to make sound decisions. (Tr. 391). Plaintiff was easily distracted. (Tr. 392). Plaintiff reported being irritable, sleeping too much, no ambition, unmotivated, and often tired. Plaintiff's guardian insisted Plaintiff had ADD and needed Vyvanse. It was explained this needed to be discussed with the doctor. (Tr. 392).

On August 24, 2016, Plaintiff was discharged from mental health because she moved. (Tr. 394). Current medications were trazodone and Vyvanse. (Tr. 394).

**2017**

In May 2017, Plaintiff had face-to-face SSA contact. Plaintiff had difficulty understanding, talking, and answering. (Tr. 275). Plaintiff was child-like. Plaintiff had dirty nails despite a passionate interest in getting her nail tech license. Plaintiff talked really fast and had a bit of a speech impediment, but it did not prevent the SSA staff from understanding her. Plaintiff was friendly, polite, and apologetic for not completing a form, saying she did not understand it. (Tr. 276).

On June 1, 2017, Plaintiff was seen by mental health. (Tr. 399, 422, 426). Diagnosis was unspecified depressive disorder. (Tr. 399). Plaintiff's listed complaint was to get back on medication, "helps me concentrate, get stuff off my chest." Plaintiff reported poor focus, depression, anxiety, anger issues, and learning problems. "I've been told by many people it will be hard for me to work because I have anger issues and will snap at people." (Tr. 400). Plaintiff reported her family states she "does better" on medication. (Tr. 400). Plaintiff reported wanting to get her nail tech license. (Tr. 403). Plaintiff had volunteered at the humane society. (Tr. 403). Upon exam, Plaintiff

had child-like attitude, expansive affect, euphoric mood, poor judgment/insight, and mild impairment in memory.  Plaintiff had calm behavior, playing with a fidget spinner. Plaintiff was easily distracted. (Tr. 405). Plaintiff reported she had never assaulted someone. (Tr. 405). Plaintiff reported her symptoms started after being abandoned and then being moved around between caretakers. (Tr. 405). Plaintiff's goal was to stay on medication to keep her temper under control. (Tr. 406). Plaintiff was immature in her presentation. (Tr. 406).

On July 12, 2017, Plaintiff completed an adult function report. (Tr. 294). Plaintiff reported that she cannot work because she misunderstands people. Because of her anger issues, she gets frustrated easily. Plaintiff purports that she is easy to take advantage of and she has a low reading and comprehension level. (Tr. 286). Plaintiff takes care of her pets. (Tr. 288). Plaintiff has no problem with personal care. (Tr. 288). Plaintiff needs reminders to take medication. Plaintiff can do chores. (Tr. 289). Plaintiff reported she likes to knit, crotchet, and sew. Plaintiff plays video games and watches YouTube. Plaintiff loves to draw and paint. (Tr. 291). Plaintiff goes to church and the park. (Tr. 291). Plaintiff reports she has always been like this since she was little. Plaintiff forgets to finish tasks or gives up. Others get on her nerves. (Tr. 292). Plaintiff reports no problem with authority and that she can follow instructions, but it just takes longer. Plaintiff reported she used to be on medication, lost her doctor, and now is trying to be put back on medication. (Tr. 294).

On a different form, Plaintiff reported in July 2017 her depression, mood swings, and insomnia had worsened. (Tr. 307). Plaintiff made a similar report of changes in September 2017. (Tr. 316).  Plaintiff reported she had anger outbursts and needed to be reminded to shower. (Tr. 310).

On July 26, 2017, Dr. Steadham, Ph.D., a non-examining state agency consultant reviewed the record and found that Dr. Moody's statements were not persuasive because it was not consistent

with her functional abilities and was not supported by objective testing. (Tr. 84). Plaintiff could understand/remember simple instructions but would have difficulty with complex instructions. (Tr. 86). Plaintiff could attend to and perform simple, unskilled tasks for reasonable periods of time without special supervision. (Tr. 87). Plaintiff could interact appropriately with supervisors and coworkers. (Tr. 87). Plaintiff would do best working alone or in small groups and with limited contact with the public. Plaintiff could make simple work-related decisions. Plaintiff would do best with routine tasks and few demands for change and with pre-set goals and objectives. (Tr. 88). On October 3, 2017, Dr. Ward, Ph.D. affirmed this assessment. (Tr. 114-118).

On August 1, 2017, Plaintiff was seen by mental health. Plaintiff was there with her father, who by Dr. Moody's exam was alleged to have abused Plaintiff in the past. (Tr. 420). Plaintiff was cared for by her stepmother for many years then moved in with her father. Plaintiff had training for nail care. Plaintiff was supposed to take a test and was sent the money for the test, but then her stepmother kept the money. (Tr. 420). Plaintiff needed medication that helped her pay attention and be less irritable. (Tr. 420). Plaintiff had been without medication. (Tr. 420). Upon exam, Plaintiff had intact attention/concentration, euthymic mood, and good insight/judgment. (Tr. 421). Plaintiff was referred for Vyvanse as Plaintiff and her father noticed great improvement when Plaintiff is able to take it. Plaintiff was given "second line Wellbutrin XL to aid in her need to concentrate and have a better mood." (Tr. 421).

On November 1, 2017, Plaintiff was seen by mental health for anger problems.  (Tr. 418). Upon exam, Plaintiff had calm behavior, logical thought process, angry irritable mood, intact memory, and mild impairment in attention. (Tr. 418).

8

**2018**

On January 29, 2018, Plaintiff reported she did not fill Lamictal because her father was getting remarried and they did not have enough money. Plaintiff reported her mood was generally good. Plaintiff was upset she had a puppy that died after a few days; someone may have poisoned it. Upon exam, Plaintiff had unkempt appearance and signs of poor personal hygiene. Plaintiff had calm behavior, mild speech impediment, euthymic mood, intact attention/concentration, intact memory, and fair judgment/insight. (Tr. 416).

On May 4, 2018, Plaintiff was seen by mental health. Plaintiff's mother reported how well she was doing; it was the difference between night and day as to mood stability. Plaintiff's medications were Lamictal and Trazodone. (Tr. 414). Upon exam, Plaintiff had an unkempt appearance. (Tr. 414). Plaintiff had calm behavior, logical thought process, euthymic mood, appropriate affect, good judgment/insight, intact memory, and intact attention/concentration. (Tr. 414).

On July 9, 2018, Plaintiff was seen by mental health. Plaintiff reported continuing to do well on her current medication regimen. "Her mood has been stable." "She is bright in affect and is discussing her pleasure in caring for her dogs." (Tr. 412). Upon exam, Plaintiff had calm behavior, logical thought process, euthymic mood, appropriate affect, intact memory, intact attention/concentration, and good judgment/insight. Diagnosis were major depressive disorder, recurrent episode, moderate and ADHD, predominantly inattentive presentation. (Tr. 412).

On October 9, 2018, Plaintiff was seen by mental health. Plaintiff continued to do well on her current medication. Plaintiff's mood was stable. Plaintiff was bright in affect and discussed pleasure in caring for toddler relatives. Plaintiff felt trazodone was no longer helpful for sleep. (Tr.

436). Upon exam, Plaintiff had euthymic mood, intact memory, intact attention/concentration, and good insight/judgment. (Tr. 436).

**2019**

On January 11, 2019, Plaintiff was seen by mental health. Plaintiff had bright affect and was calm and cooperative. Plaintiff stated Lamictal was especially helpful in keeping her mood level and she no longer has anger outbursts. It was unclear if she was taking Remeron. (Tr. 435). Upon exam, Plaintiff had calm behavior, euthymic mood, intact memory, intact attention/concentration, and fair judgment/insight. (Tr. 435, 681). In March 2019, Plaintiff reported medication of lamotrigine for anger control. (Tr. 334). .

In June 2019, Plaintiff was seen by mental health with her grandmother. (Tr. 679). Plaintiff was more subdued, calm, and cooperative. Plaintiff was grieving a death. Upon exam, Plaintiff had depressed mood, constricted affect, intact concentration, and fair insight. (Tr. 679).

**2020**

In February 2020, Plaintiff was seen by mental health. Plaintiff admitted being noncompliant with Lamictal for a year. Plaintiff's family reported she was much less irritable. (Tr. 677). Plaintiff denied depressive or anxiety symptoms. Exam was normal except for poor judgment and insight.

In May 2020, Plaintiff was seen by mental health. Plaintiff was cheerful and pleasant and had been compliant with Lamictal. Plaintiff stated she felt more stable in her mood, but her family still said she was somewhat irritable. (Tr. 675). Exam was irritable mood, intact concentration, and fair insight. (Tr. 675).

In August 2020, Plaintiff was seen by mental health. Plaintiff reported her mood was stable and felt like Lamictal was beneficial in controlling irritability and anger issues. (Tr. 673). Plaintiff's

exam was normal. (Tr. 673).

**2021**

In January 2021, Plaintiff was seen by mental health, noting Plaintiff had been noncompliant with Lamictal stating she took one pill here and there if she could remember and it was not helping because there was a lot going on around the house. Plaintiff was told Lamictal would be ceased because it was very dangerous to be going on and off that dosage sporadically. Strattera was prescribed. (Tr. 671). Plaintiff examined with calm behavior. Plaintiff had mild impairment in memory and concentration and poor judgment and insight. (Tr. 671).

In April 2021, Plaintiff was seen by mental health. Plaintiff reported Strattera helped her concentrate and be less irritable. Plaintiff had poor insight. (Tr. 669). Records from mental health indicated starting in May 2021 Plaintiff was at a level of care of mild symptoms. (Tr. 661)

In August 2021, Plaintiff was seen in the office for the first time since the pandemic restrictions. Plaintiff reported Strattera helped her concentrate and be less irritable. She thinks the bottle got knocked off a table, she could not find it, and was not able to call to get her refill. Plaintiff was given the number to call. (Tr. 667). Plaintiff denied depression. (Tr. 667). Plaintiff had good mood. Plaintiff had impaired judgment and insight. (Tr. 668).

In December 2021, Plaintiff was seen for a medication check. Plaintiff reported Strattera helped her concentrate and be less irritable, but she felt more depressed lately. Lexapro was discussed. (Tr. 665). Plaintiff had intact memory/concentration and fair insight. (Tr. 665).

**2022**

In March 2022, Plaintiff was seen by mental health for medication check. Plaintiff was calm and cooperative. Plaintiff was a poor historian due to cognitive limitations. Plaintiff stopped taking

Strattera due to an arm rash but was encouraged to take it again. Plaintiff never received Lexapro but did not call to let anyone know; Lexapro was not covered anyway. Plaintiff stated she did a lot of the housework. (Tr. 662). Upon exam, Plaintiff had a depressed mood. (Tr. 662). Plaintiff had intact memory/concentration and impaired insight. (Tr. 663).

In June 2022, Plaintiff reported medication of Pristiq for anxiety and Strattera for ADHD. (Tr. 646). Plaintiff submitted a migraine log for 2022. (Tr. 659).

In July 2022, Plaintiff was seen by mental health. Plaintiff was calm, pleasant, and cooperative. Plaintiff reported being off medications for over a month because she had lost some paperwork. Plaintiff reported the medications were helpful when she took them. Plaintiff reported doing a lot of the housework and babysitting in the home with a large extended family. (Tr. 685). Upon exam, Plaintiff had irritable mood and blunted affect. (Tr. 685).

**Hearing Testimony**

In May 2019, Plaintiff, represented by an attorney, testified at a hearing before ALJ Alice Jordan. Plaintiff's attorney noted the prior final adjudication of cessation of benefits. (Tr. 38). The filing date was discussed to be the amended alleged onset date but a form was not completed. (Tr. 39). Plaintiff was twenty-one years old at the hearing. (Tr. 39). Plaintiff lives with her grandmother, sisters, brother, father, and mother. (Tr. 40). Plaintiff had no insurance. (Tr. 41). Plaintiff testified she did not have any training after high school. (Tr. 42). During the day, Plaintiff plays with her phone, watches Netflix, or plays with her sister. (Tr. 43). Plaintiff sometimes visits a friend. Plaintiff goes to church once every other week. (Tr. 43). Plaintiff can do chores but must be reminded. (Tr. 44). Plaintiff can babysit her three siblings. (Tr. 45). Plaintiff gets too frustrated looking at the driving license test online. (Tr. 45). Plaintiff draws, paints, knits, and crotchets. (Tr. 45). Plaintiff

learned to knit while in DSS custody. (Tr. 45). Plaintiff will go to the park with her family. (Tr. 46).

Plaintiff takes care of her hygiene but sometimes must be reminded. (Tr. 46). Anger was Plaintiff's

most severe problem. (Tr. 47). Plaintiff gets frustrated if she does not understand how to do

something. (Tr. 48). If someone tells her to do something but does not say how, she gets very

frustrated and this happened with nail tech class. (Tr. 49). Plaintiff reported she had a little bit of

depression when something happens like a death in the family. Plaintiff isolates. (Tr. 50). Plaintiff

hits herself when she has anger spells. (Tr. 51-52). Plaintiff reported she had problems concentrating:

"If I'm supposed to be doing one thing, I will lollygag around and not do it, and it takes me a longer

time to get finished with it." (Tr. 52).  Plaintiff hides when there are new people around. (Tr. 53).

Plaintiff testified that nail tech class was part of her public school education. (Tr. 54). Plaintiff was

in all self-contained classes. (Tr. 56).

In 2022, Plaintiff testified she lived with her father, grandmother, and sister. (Tr. 467).

Plaintiff was in special education and graduated with a certificate of completion. (Tr. 468). Plaintiff

had no additional vocational training. (Tr. 469). Plaintiff testified she helped her family cook and

she played or watched videos on electronics. (Tr. 469). Plaintiff talks to her family. (Tr. 469).

Plaintiff helps do the laundry, dishes, and other chores. (Tr. 470). Plaintiff does not have a driver's

license. (Tr. 471). Plaintiff likes to draw, paint, knit, and crochet. (Tr. 471). Plaintiff testified her

most severe problem was if someone snaps at her, she will snap back. (Tr. 472). Plaintiff testified

that she had gotten much better at managing her anger. (Tr. 472). Plaintiff goes to counseling every

two months and a psychiatrist for medication every three months. (Tr. 473). Plaintiff testified she

still had anger outbursts every once in a while but not as bad as the first time she testified. (Tr. 475).

Plaintiff forgets to finish chores sometimes. (Tr. 475-476). Plaintiff thought she could not keep or

get a job because she was terrified she would have a day where she was in a bad mood and someone

would snap at her and she would snap back. (Tr. 478). Plaintiff's attorney did not ask any additional

limitations of the VE regarding coworker interaction but asked about requiring frequent supervision.

(Tr. 484).

### C.    The ALJ's Decision

In the decision of November 2022, the ALJ made the following findings of fact and

conclusions of law (Tr. 440-455):

1.    Born on November 16, 1997, the claimant had not attained age 22 as of December 31, 2006, the alleged onset date (20 CFR 404.102, 416.120(c)(4) and 404.350(a)(5)).

2.    The claimant has not engaged in substantial gainful activity since December 31, 2006, the alleged onset date (20 CFR 404.1571 *et seq*., and 416.971 *et seq*.).

3.    The claimant has the following severe impairments: borderline intellectual functioning, depression, attention deficit hyperactivity disorder, and specific learning disability with impairment in spelling, reading, and reading comprehension (20 CFR 404.1520(c) and 416.920(c)).

4.    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.    After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following non-exertional limitations: The claimant can understand and remember simple, routine instructions, but would have difficulty with complex instructions; she can maintain attention and concentration for reasonable periods of time in an eight-hour workday, with usual breaks every two hours, for simple, routine, and repetitive tasks persistence and pace for at least a two-hour period during an eight- hour day for a total of eight hours with regular breaks every two hours for simple, routine, repetitive tasks to complete an eight-hour workday and forty-hour workweek without special supervision; she can adapt to requests for change and make simple, work-related decisions; the claimant should have no more

14

than occasional, superficial interaction with the public and no more than frequent interaction with co-workers.

6.  The claimant has no past relevant work (20 CFR 404.1565 and 416.965).

7.  The claimant was born on November 16, 1997 and was 9 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8.  The claimant has at least a high school education (20 CFR 404.1564 and 416.964).

9.  Transferability of job skills is not an issue because the claimant does not have past relevant work (20 CFR 404.1568 and 416.968).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569a, 416.969, and 416.969a).

11. The claimant has not been under a disability, as defined in the Social Security Act, from December 31, 2006, through the date of this decision (20 CFR 404.350(a)(5), 404.1520(g) and 416.920(g)).

## II. DISCUSSION

Plaintiff argues the ALJ found the opinions of Drs. Steadham and Ward, nonexamining state agency consultants, persuasive but failed to explain why their opinions of "can interact appropriately with supervisors and coworkers but would do best working alone or in small groups" was not included in the RFC determination. The RFC contained frequent  interaction with coworkers. Defendant argues the ALJ applied the correct law and relied on substantial evidence in finding Plaintiff not disabled.

## A.    LEGAL FRAMEWORK

### 1.    The Commissioner's Determination–of–Disability Process

The Act provides that disability benefits shall be available to those persons insured for

benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. § 423(a). Section 423(d)(1)(A) defines disability as: the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months. 42 U.S.C. § 423(d)(1)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of disability to a series of five sequential questions. *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 460 (1983) (discussing considerations and noting the "need for efficiency" in considering disability claims). An examiner must consider the following: (1) whether the claimant is engaged in substantial gainful activity ("SGA"); (2) whether he has a severe impairment; (3) whether that impairment meets or equals an impairment included in the Listings;[1] (4) whether such impairment prevents claimant from performing PRW;[2] and (5) whether the impairment prevents him from doing SGA. *See* 20 C.F.R. § 404.1520. These considerations are sometimes referred to as the "five steps" of the Commissioner's disability

---

[1] The Commissioner's regulations include an extensive list of impairments ("the Listings" or "Listed impairments") the Agency considers disabling without the need to assess whether there are any jobs a claimant could do. The Agency considers the Listed impairments, found at 20 C.F.R. part 404, subpart P, Appendix 1, severe enough to prevent all gainful activity. 20 C.F.R. § 404.1525. If the medical evidence shows a claimant meets or equals all criteria of any of the Listed impairments for at least one year, he will be found disabled without further assessment. 20 C.F.R. § 404.1520(a)(4)(iii). To meet or equal one of these Listings, the claimant must establish that his impairments match several specific criteria or be "at least equal in severity and duration to [those] criteria." 20 C.F.R. § 404.1526; *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); *see Bowen v. Yuckert*, 482 U.S. 137, 146 (1987) (noting the burden is on claimant to establish his impairment is disabling at Step 3).

[2] In the event the examiner does not find a claimant disabled at the third step and does not have sufficient information about the claimant's past relevant work to make a finding at the fourth step, he may proceed to the fifth step of the sequential evaluation process pursuant to 20 C.F.R. § 404.1520(h).

16

analysis. If a decision regarding disability may be made at any step, no further inquiry is necessary. 20 C.F.R. § 404.1520(a)(4) (providing that if Commissioner can find claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step).

A claimant is not disabled within the meaning of the Act if he can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work. See 20 C.F.R. Subpart P, § 404.1520(a), (b); Social Security Ruling ("SSR") 82–62 (1982). The claimant bears the burden of establishing his inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such work exists in the regional economy. To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that claimant can perform despite the existence of impairments that prevent the return to PRW. *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). If the Commissioner satisfies that burden, the claimant must then establish that he is unable to perform other work. *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981); *see generally Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987) (regarding burdens of proof).

### 2.    The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner [ ] made after a hearing to which he was a party." 42 U.S.C. § 405(g). The scope of that federal court review is narrowly-tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal

standard in evaluating the claimant's case. *See id.*; *Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls*, 296 F.3d at 290 (*citing Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try these cases *de novo* or resolve mere conflicts in the evidence." *Vitek v. Finch*, 438 F.2d 1157, 1157-58 (4th Cir. 1971); *see Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir.1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). Rather, the court must uphold the Commissioner's decision if it is supported by substantial evidence. "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005). Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings and that her conclusion is rational. *See Vitek*, 438 F.2d at 1157-58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed "even should the court disagree with such decision." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972). Substantial evidence as a threshold is "not high;" "[u]nder the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains "sufficien[t] evidence" to support the agency's factual determinations." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019).

## B.     ANALYSIS

### RFC/Drs. Steadham and Ward

Plaintiff argues the ALJ found the opinions of Drs. Steadham and Ward, nonexamining state agency consultants, persuasive but failed to explain why their opinions of "can interact appropriately with supervisors and coworkers but would do best working alone or in small groups" was not included in the RFC determination. The ALJ determined Plaintiff had the ability to frequently interact with coworkers.

18

An adjudicator is solely responsible for assessing a claimant's RFC.  20 C.F.R. § 416.946(c).

In making that assessment, he must consider the functional limitations resulting from the claimant's

medically determinable impairments.  Social Security Ruling ("SSR") 96–8p, 1996 WL 374184, at

*2.  This ruling provides that: "The RFC assessment must include a narrative discussion describing

how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings)

and nonmedical evidence (e.g., daily activities, observations)."  SSR 96–8, *7.  "The adjudicator

must also explain how any material inconsistencies or ambiguities in the evidence in the case record

were considered and resolved."  *Id.*  Additionally, " 'a necessary predicate to engaging in a

substantial evidence review is a record of the basis for the ALJ's ruling,' including 'a discussion of

which evidence the ALJ found credible and why, and specific application of the pertinent legal

requirements to the record evidence.' "  *Monroe v. Colvin*, 826 F.3d 176, 189 (4th Cir. 2016)

(*quoting Radford v. Colvin*, 734 F.3d 288, 295 (4th Cir. 2013)).  The ALJ considers the evidence in

the record as a whole when analyzing Plaintiff's claims, as does this court when reviewing the ALJ's

decision.  *See Craig*, 76 F.3d at 595.

The ALJ found an RFC of:

> a full range of work at all exertional levels but with the following non-exertional
> limitations: The claimant can understand and remember simple, routine instructions,
> but would have difficulty with complex instructions; she can maintain attention and
> concentration for reasonable periods of time in an eight-hour workday, with usual
> breaks every two hours, for simple, routine, and repetitive tasks persistence and pace
> for at least a two-hour period during an eight- hour day for a total of eight hours with
> regular breaks every two hours for simple, routine, repetitive tasks to complete an
> eight-hour workday and forty-hour workweek without special supervision; she can
> adapt to requests for change and make simple, work-related decisions; the claimant
> should have no more than **occasional, superficial interaction with the public and
> no more than frequent interaction with co-workers**.

(Tr. 447)(emphasis added).

In July 2017, nonexamining state agency consultant Dr. Steadham, Ph.D. noted "social

19

allegations are not supported objectively nor diagnostically." (Tr. 84). Plaintiff was not significantly limited in the ability to work in coordination with or in proximity to others without being distracted by them. (Tr. 87). Plaintiff was moderately limited in the ability to interact appropriately with the general public and moderately limited in the ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes. (Tr. 87). Importantly in the narrative explanation, Dr. Steadham stated Plaintiff "can interact appropriately with supervisors and coworkers, but would do best working alone or in small groups. She will do best with limited contact with the general public." (Tr. 87). In October 2017, Dr. Ward, Ph.D. reviewed records and found no significant difference from the prior rating and found Dr. Steadham's assessment persuasive, supported, and consistent with the new evidence. (Tr. 114,116-118).

The ALJ found these opinions persuasive. (Tr. 452). The ALJ specifically noted that the consulting specialists "found that the claimant could attend work regularly and interact appropriately with supervisors and coworkers, but that she would do best with limited contact with the general public." (Tr. 452). The ALJ found the opinions persuasive because they were consistent with the record of Plaintiff attending church every other week, watching television most of the day, and the ability to watch her younger siblings. The ALJ found the consultants' findings were supported by evidence that Plaintiff's Lamictal was helpful and keeping mood level, Plaintiff no longer had anger outbursts, and records showed mental exams as normal. (Tr. 452).

The court is not left to guess how the ALJ reached this RFC. A claimant's RFC is her "maximum remaining ability to do sustained work activities in an ordinary work setting" for eight hours a day, five days a week despite his or her medical impairments and related symptoms. SSR 96-8p, 1996 WL 374184, at *2. An ALJ is not required to convert an opinion or any part of an opinion into an exact RFC limitation. *See Felton-Miller v. Astrue*, 459 Fed. Appx. 226, 230-231 (4th

Cir. 2011); *Funk v. Kijakazi*, 2022 WL 205478, at *6 (W.D. Va. Jan. 24, 2022); 20 C.F.R. §§ 404.1527(d)(2), 404.1546(c). An RFC is based on all the medical evidence, opinions, and supported consistent allegations. 20 C.F.R. § 404.1545. "The fact that the RFC determination does not perfectly track a medical opinion does not automatically give rise to the presumption that the two...are inconsistent." *Erwin v. Comm'r*, No. 9:20-CV-00229-DCN-MHC, 2021 WL 4692300, at *5 (D.S.C. May 6, 2021), *report and recommendation adopted sub nom.*, 2021 WL 3929041 (D.S.C. Sept. 2, 2021). The ALJ determines the RFC; it is not automatically dictated by the opinions in the record. This is true even in circumstances where the ALJ found the medical opinions persuasive. *See, e.g., Coble v. Saul*, 2020 WL 5763463, at *7 (M.D.N.C. Sept. 28, 2020) ("[T]he ALJ was not required to adopt every portion of Dr. Johnson's assessment even though the ALJ gave it significant weight."); *Newton v. Saul*, No. 9:18-cv-1608-CMC-BM, 2019 WL 3769880, at *9 (D.S.C. July 11, 2019)(where the ALJ gave great weight to a consultative psychological examiner, "the ALJ is not required to adopt an opinion in its entirety or include every degree of limitation in an RFC"), *report and recommendation adopted*, 2019 WL 3766480 (D.S.C. Aug. 8, 2019); *see also Wilkinson v. Comm'r*, 558 Fed. Appx. 254, 256 (3d Cir. 2014)("[N]o rule or regulation compels an ALJ to incorporate into an RFC every finding made by a medical source simply because the ALJ gives the source's opinion as a whole 'significant' weight."). Thus, the ALJ did not err in making the RFC determination. To the contrary, the ALJ adequately explained the RFC, and the court is not left to guess at how the ALJ reached the RFC finding regarding social interaction.

While SSR 96-8p,*7 states that if an RFC conflicts with an opinion, the ALJ must explain why the opinion was not adopted, Plaintiff fails to show a conflict. Two consultants found persuasive by the ALJ found Plaintiff "can interact appropriately with supervisors and coworkers" and the ALJ gave an RFC of frequent interaction with coworkers. (Tr. 447). "Can interact appropriately" and

"would do best[3] working alone or in small groups" both stated by the same consultants are not necessarily inconsistent. The instant ALJ did not create any self-made conflict in need of resolution and did not ignore the opinions in formulating the RFC. An RFC of frequent interaction with coworkers is not in conflict with "can interact appropriately."

In light of the foregoing, substantial evidence supports the ALJ's evaluation of the plaintiff's social interaction limitations.[4] The court cannot say that a reasonable mind would not reach this RFC in view of the totality of the evidence. The ALJ supported the functional limitations found in the ALJ's RFC determination with discussion and citation to substantial evidence in the record. Even where there is evidence that might have resulted in a contrary decision, our review is limited to whether substantial evidence supports the ALJ's decision. An RFC is "an administrative assessment made by the Commissioner based on all the relevant evidence in the case record." *Felton-Miller v. Astrue*, 459 Fed. Appx. 226, 230-31 (4th Cir. 2011) (citing 20 C.F.R. §§ 404.1546(c), 416.946(c)). The court does not reweigh the evidence. *See Johnson v. Saul*, No. 5:20-cv-47-KDW, 2021 WL 717250, at *10 (D.S.C. Feb. 24, 2021)("Even if the evidence highlighted by Plaintiff could support a different result, the court's role is not to second-guess the ALJ's findings.")  Based upon the foregoing, substantial evidence supports the ALJ's RFC.

---

[3] *See Ali v. Pruitt*, 727 Fed. Appx. 692, 696 (D.C. Cir. 2018)(noting an opinion that one "would do best" in a private space was only a vague recommendation); *Forcier v. Colvin*, 2015 WL 12669891, at *5 (E.D. Wash. Dec. 14, 2015), *report and recommendation adopted*, 2016 WL 6039231 (E.D. Wash. Jan. 5, 2016)(finding an assessment of what "would be best" was not obligated to be accepted and had limited relevance).

[4] Further, at Step Five, for all jobs found by the ALJ, the DOT states "People:8-Taking Instructions-Helping-not significant" and "Talking: not present-activity or condition does not exist." The jobs opined here appear to have little to no social interaction.

### III.  CONCLUSION

This court is charged with reviewing the case only to determine whether the findings of the Commissioner were based on substantial evidence. *Richardson*, 402 U.S. at 390.  Even where the Plaintiff can produce conflicting evidence which might have resulted in a contrary decision, the Commissioner's findings must be affirmed if substantial evidence supported the decision. *Blalock*, 483 F.2d at 775.  The Commissioner is charged with resolving conflicts in the evidence, and this Court cannot reverse that decision merely because the evidence would permit a different conclusion. *Shively v. Heckler*, 739 F.2d 987, 989 (4th Cir. 1984).   As previously discussed, despite the Plaintiff's claims, he has failed to show that the Commissioner's decision was not based on substantial evidence.  Based upon the foregoing, and pursuant to the power of the court to enter a judgment affirming, modifying, or reversing the Commissioner's decision with remand in social security actions under sentence four of Sections 205(g) and 1631(c)(3) of the Social Security Act, 42 U.S.C. Sections 405(g) and 1338(c)(3), the Commissioner's decision is AFFIRMED.


                                                    s/ Thomas E. Rogers, III
September 27,  2023                                 Thomas E. Rogers, III
Florence, South Carolina                            United States Magistrate Judge

23